LILIANA SAN JUAN LÁBARO, EX PARTE, peticionaria y recurrente, MANUEL SAN JUAN, HIJO, EX PARTE, peticionario y recurrido; HAYDEÉ SAN JUAN LINCOLN, LILIANA SAN JUAN DE GONZÁLEZ, BÁRBARA A. LINCOLN SAN JUAN, IVELISE SAN JUAN LÁBARO, CARMEN ANNA HERTELL, MARÍA ROSA GONZÁLEZ DE CORTÉS, ERIKA M. HERTELL SAN JUAN, ISABEL ELENA GONZÁLEZ SAN JUAN y RAFAEL M. GONZÁLEZ SAN JUAN, coherederos y recurrentes; THOMAS R. LINCOLN SAN JUAN, coheredero recurrido.

*Número:* RE-88-567        *Resuelto:* 23 de abril de 1990

*David Carrión Fuentes*, abogado de la recurrente; *Eduardo René Estades*, abogado del recurrido; *Thomas R. Lincoln San Juan, pro se*, coheredero recurrido.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

## I

Don Manuel San Juan Rodríguez falleció el 1ro de julio de 1987 en su residencia en Guaynabo, Puerto Rico. Como familiares más próximos le sobrevivieron su viuda Doña Carmen Lábaro Cruzado; sus hijos Víctor Manuel, Haydeé, Ivelisse y Liliana, de apellidos San Juan Lábaro; sus hermanas Providencia, Blanca, Francisca e Isabel, de apellidos San Juan Rodríguez, y dieciséis (16) nietos.

En vida Don Manuel le entregó a su hija Liliana un sobre con la instrucción verbal de que lo abriera cuando él falleciera. Ocurrido ese inexorable suceso, Liliana —en presencia de sus hermanos— lo abrió y en su interior encontró una *copia del testamento abierto* otorgado por su padre el 30 de diciembre de 1972 ante el notario Jacobo Ortiz Murias mediante la Escritura Pública Núm. 93. En la primera página de *esa* copia, Don Manuel había escrito la palabra "nulo" y, al lado, sus iniciales.

Además de esta copia del testamento abierto, Liliana halló un sobre cuyo *exterior* tenía en manuscrito lo siguiente: "Esta es nuestra última voluntad." Apéndice I, pág. 6. Debajo de esta oración estaban las firmas de Don Manuel y de Doña Carmen. En el *interior* de este sobre había un pliego de papel tamaño carta escrito por ambos lados de puño y letra —en su mayoría por Don Manuel y el remanente por Doña Carmen— cuyo contenido total disponía:

> Mi esposa Carmen Lábaro Cruzado, y yo, Manuel San Juan Rodríguez, luego de pensarlo bien hemos acordado y así lo hacemos constar con la presente que no es ya necesario el testamento ante el Lcdo. Jacobo Ortiz Murias, y por tanto, rechazamos y anulamos tal testamento. En su lugar, hacemos saber que es nuestra voluntad

que cual[es]quiera bienes habidos durante nuestro matrimonio sean divididos y distribuidos como sigue: una tercera parte para nuestros cuatro hijos; una tercera parte para nuestros nietos en partes iguales; y una tercera parte para nuestras dos hijas, Haydeé e Iveli[s]se, en adición a lo ya otorgado. Todo se efectuará sin albacea; pero con el consejo de un Contador Público Autorizado y como repartidora nuestra hija Liliana San Juan Lábaro. Suplicamos a todos que entiendan la razón de nuestros deseos y voluntades.

Manolo y yo estamos completamente de acuerdo con esta decisión como nuestra última voluntad.

Diciembre 31 de 1976

Manuel San Juan

Carmen Lábaro

Solicitud de revisión, págs. 2–3.

Con vista a estos documentos, el 7 de julio de 1987 Liliana presentó una Solicitud de Protocolización de Testamento Ológrafo ante el Tribunal Superior, Sala de Bayamón (Civil Núm. 87–3140). En síntesis, expuso los hechos antes relacionados y pidió que el documento manuscrito antes transcrito se reconociera como testamento ológrafo, genuino y auténtico de Don Manuel y se ordenara su protocolización. Acompañó los originales de los documentos.

Pendiente esa solicitud, el 25 de enero de 1988 su hermano Víctor Manuel San Juan Lábaro instó separadamente en el mismo foro una petición jurada sobre expedición de cartas testamentarias fundamentada en el testamento abierto de 30 de diciembre de 1972 (Civil Núm. 88–274). Adujo que dicho testamento abierto no había sido revocado, anulado o modificado legalmente, según certificación del Registro de Testamentos, que en el mismo fue instituido albacea del caudal hereditario y, que había aceptado el cargo mediante juramento ante notario. El 3 de febrero de 1989 el tribunal accedió.

Poco tiempo después, el 25 de marzo —en la acción sobre protocolización de testamento ológrafo (Civil Núm. 87–3140)— compareció por derecho propio Thomas R. Lincoln San Juan, quien alegó ser nieto y heredero del causante y pidió la desestimación. Argumentó que dicho testamento era nulo por ser

mancomunado y que debía subsistir el testamento abierto otorgado en 1972. Subsiguientemente, Víctor Manuel San Juan Lábaro solicitó intervenir en esa instancia y reprodujo esa alegación.

Acaecieron varios trámites procesales. A solicitud de todas las partes el tribunal decretó la consolidación de ambos casos. Señalada la vista de protocolización de testamento ológrafo se discutió la desestimación solicitada. En Sala, el tribunal de instancia accedió y redujo su dictamen a escrito el 15 de agosto de 1988.(1) Al negar la solicitud de protocolización del testamento ológrafo, el ilustrado foro (Hon. Juan José Ríos Martínez, Juez) se fundamentó en el Art. 618 del Código Civil, 31 L.P.R.A. sec. 2123, preceptivo de que "[n]o podrán testar dos o más personas mancomunadamente, o en el mismo instrumento, ya lo hagan en provecho recíproco, ya en beneficio de un tercero", y lo resuelto en *Ríos v. Registrador*, 57 D.P.R. 739 (1940). Determinó que por ser nulo el testamento no era necesario recibir prueba sobre su autenticidad.

Además, en cuanto al reclamo de nulidad del testamento abierto de 1972, resolvió en contra del modo siguiente:

> Asumiendo que en la referida copia de la escritura la palabra manuscrita que aparece en la primera página de la misma que dice "nulo", seguida de unas letras (si es que son letras) fuesen escritas de puño y letra por el testador Manuel San Juan Rodríguez la controversia gira a determinar si con la inserción de esa palabra y esas letras se estaba revocando o no el testamento. Dicho en otras palabras, si el testador revocó el referido testamento al insertar esas palabras. *No tenemos duda alguna que esa no es la forma en ley para revocar* un testamento. (Énfasis suplido.) Apéndice I, págs. 81–82.

---

(1) En su alegato, la recurrente Liliana San Juan Lábaro argumenta que en esa vista algunos coherederos solicitaron presentar prueba testifical para demostrar que el causante les había expresado verbalmente —en varias ocasiones— haber revocado el testamento abierto de 1972 y que su intención era que su última voluntad estuviese recogida en el ológrafo. Se queja de que el tribunal de instancia no lo permitió. Por su parte, el recurrido Thomas R. Lincoln San Juan niega que se hiciera ese ofrecimiento de prueba. Por el resultado al que arribamos en esta decisión, el planteamiento no es determinante y nos abstendremos de discutirlo.

Subsiguientemente, en reconsideración, reiteró su dictamen. Inconforme, a solicitud de doña Liliana, acordamos revisar.[2]

## II

La única interrogante jurídica planteada ante nos es si el testamento abierto otorgado en 1972 ante el notario Ortiz Murias fue dejado sin efecto por el testador Don Manuel San Juan Rodríguez, al éste haber insertado la palabra "nulo" y sus iniciales en la copia que poseía, deseo que alegadamente reiteró verbalmente en vida. Este restringido ámbito adjudicativo responde a que la recurrente Liliana aceptó expresamente en su recurso "la determinación del juez de instancia de que el testamento ológrafo es *nulo* por haberse realizado mancomunadamente". Solicitud de revisión, pág. 7. De haber sido válido hubiese ciertamente derogado el abierto.

La cuestión nos remite preliminarmente a los principios rectores del Código Civil sobre la revocabilidad de los testamentos y sus formas. A tal efecto, los Arts. 669 y 670 disponen, respectivamente:

El testamento no puede ser revocado en todo ni en parte sino *con las solemnidades necesarias para testar.* (Énfasis suplido.) 31 L.P.R.A. sec. 2232.

El testamento anterior queda revocado de derecho por el posterior perfecto, si el testador no expresa en éste su voluntad de que aquél subsista en todo o en parte.

Sin embargo, el testamento anterior recobra su fuerza si el testador revoca después el posterior, y declara expresamente ser su voluntad que valga el primero. 31 L.P.R.A. sec. 2233.

■ Se observa, pues, que un testamento o las disposiciones de última voluntad *son esencialmente revocables.* L. Díez-Picazo y

---

[2] Como errores discute que el tribunal de instancia no le permitió "PRESENTAR PRUEBA DOCUMENTAL Y TESTIFICAL PARA DEMOSTRAR QUE LA ÚLTIMA VOLUNTAD DEL CAUSANTE FUE REVOCAR EL TESTAMENTO ABIERTO QUE OTORGÓ EN 1972 . . . y 'resolver que no procedía anular[lo] . . . '". Solicitud de revisión, pág. 6.

A. Gullón, *Sistema de Derecho Civil*, Madrid, Ed. Tecnos, 1986, Vol. IV, págs. 560–561. Sin embargo, para que esa revocabilidad pueda llevarse a cabo y surta sus efectos legales, el Código Civil dispone determinadas solemnidades. La glosa española de los preceptos concordantes —Arts. 738 y 739 del Código Civil español— es unánime. Manresa y Navarro expone que el "acto revocativo *debe ser rodeado de las mismas garantías que el testamento verdadero y propio*. En efecto, de igual modo que el testamento deroga las normas de sucesión preconstituidas por la ley para dar vida a especiales disposiciones, el acto revocativo anula el reparto sancionado por el testador, dando vigor a la sucesión legítima. Son de tal forma dos (2) actos que, por la importancia de los efectos se corresponden, siendo lógico y natural se rodeen ambos de igual solemnidad". (Énfasis suplido.) J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, Madrid, Ed. Reus, 1972, T. V, pág. 925.

▮▮ Existen tres (3) formas de revocación: "La revocación *expresa* es aquella forma en la cual el testador dice 'expressis verbis' y en acto revestido de las solemnidades requeridas para testar, que revoca otro testamento suyo anterior en todo o en parte. Revocación *tácita* es aquella por la cual el testador cambia o altera su voluntad testamentaria otorgando un *testamento posterior*. La revocación *real* se produce cuando el testador realiza un acto del cual *racionalmente* puede concluirse que su autor ha revocado su testamento anterior." (Énfasis suplido.) E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ed. Ramallo, 1983, Vol. 11, pág. 243. Véase J. Castán Tobeñas, *Derecho Civil español, común y foral*, Madrid, Ed. Reus, 1979, T. 6, Vol. II, pág. 437. Puig Brutau señala que la revocación real se funda en un acto del testador "que el Derecho deriva de manera concluyente la voluntad de revocar el testamento". J. Puig Brutau, *Fundamentos del Derecho Civil*, Barcelona, Ed. Bosch, 1977, T. V, Vol. 2, pág. 210.

Consciente la recurrente Liliana de que el testamento ológrafo es nulo y, por ende, imposible de estimarse revocatorio del

testamento abierto de 1972, nos propone que adoptemos la tesis de que la palabra *nulo* y las iniciales —en unión a su deseo verbal— constituyen una revocación *real o material* por disposición clara y expresa del testador. Aunque reconoce que su posición ha encontrado un rechazo unánime, elabora su pedido fundamentándose en las circunstancias extraordinarias que a su juicio mediaron.

 No podemos acceder. Aparte de las disposiciones antes transcritas, el Art. 673 de nuestro Código Civil, 31 L.P.R.A. sec. 2236, visualiza la posibilidad de revocación *real* únicamente en relación con un testamento *cerrado*. Éste se presume revocado si aparece "en el domicilio del testador con las cubiertas rotas o los sellos quebrantados, o borradas, raspadas o enmendadas, las firmas que lo autoricen". Íd. Al amparo de este precepto consistentemente se ha señalado que el testamento notarial *abierto no es susceptible de revocación real*. González Tejera, *op. cit.*, pág. 256. Varias razones se aducen a favor de esa interpretación, a saber, que el Código Civil sólo se refiere a testamentos cerrados y que la "escritura matriz está fuera del alcance del testador y demás interesados. El Notario es el custodio de la misma y el hecho de que las copias expedidas se destruyan todas no afecta en nada la validez del testamento". González Tejera, *op. cit.*

F. Pastor Ridruejo, en su reputada obra *La Revocación del Testamento*, Barcelona, Ed. Nauta, 1964, pág. 322 —luego de desmenuzar los antecedentes históricos del Art. 742 del Código Civil español y comenzar con la Ley Núm. 24 del Título I de la Partida Sexta— nos dice que al presente "en definitiva, la solución favorable a la revocación del testamento abierto, se puede decir que no *cuenta hoy con un solo partidario*". (Énfasis suplido.) Expone que el original del testamento legalmente no puede romperse y, por ende, falta el fundamento de hecho para una revocación real. "La matriz está fuera del alcance legal del testador. El notario custodia la matriz en su poder. No puede destruirla, ni siquiera por orden del testador. La destrucción es un supuesto 'teórico', imposible y, además, ilegal. La rotura de la

matriz, por ser ilegal, *no puede ser admitida como negocio jurídico revocatorio*. Es un medio 'expresivo'. De esto no hay duda: 'Si se trata de hacer patente el deseo revocatorio, dice ALBALADEJO, creo que bien lo manifiesta el que asalta el protocolo notarial y recorre todos los rincones donde pudo quedar vestigio de su testamento para destruirlos'. *Pero dar a esta expresividad ilegal fuerza negocial es imposible.*" (Énfasis suplido.) Pastor Ridruejo, *op. cit* ., pág. 327. Según su opinión, no es la carencia de fuerza expresiva de la destrucción de la copia lo que impide la revocación, sino la falta de solemnidad. "El argumento decisivo es la carencia de solemnidad de la revocación real del testamento abierto. Ya hemos dicho que toda revocación real es ritual. Es decir, constituye una manifestación de voluntad, tipificada por la ley. No aceptamos la revocación real porque exterioriza suficientemente una voluntad interior revocatoria. La admitimos porque exterioriza típicamente, es decir de modo ritual y admitido taxativamente por la ley, tal voluntad." Pastor Ridruejo, *op. cit.*, pág. 325.

A *igual* conclusión llegan M. Albaladejo García, *Cuestiones en materia de revocación de testamentos*, Madrid, Anales de la Academia Matritense, 1961, pág. 48; J.L. Lacruz Berdejo, *Derecho de Sucesiones*, Barcelona, Ed. Labor, 1971, T. I, pág. 519; F. Clemente De Diego, *Instituciones de Derecho Civil Español*, Madrid, Librería General de Victoriano Suárez, 1959, T. III, pág. 267; X. O'Callaghan Muñoz, *Compendio de Derecho Civil*, Madrid, Ed. Edersa, 1987, pág. 181, y F. Puig Peña, *Compendio de Derecho Civil Español*, Madrid, Ed. Pirámide, 1976, pág. 314.

En resumen, según nuestro ordenamiento jurídico vigente, *un testamento abierto* no es susceptible de revocación *real*. A fin de cuentas, "si alguien muere sin revocar, porque, por las razones que sea, sólo tuvo a su alcance, en la práctica, la revocación real, nos encontraríamos en su supuesto análogo al de que alguien muriese sin testar *por culpa de las solemnidades que se exigen para ello*. Tanto una cosa como otra han de ser asaz insólitas ante la variedad de formas testamentarias que el Código acoge, *pero el hecho de que puedan acaecer, no justifica el cambio de sistema,*

*porque resultaría que los miles de casos que ofrece la vida diaria habrían de soportar los inconvenientes de otro sistema pensado para un caso de laboratorio".* (Énfasis suplido.) Albaladejo, *op. cit.,* pág. 51.

En el caso de autos subsiste el testamento abierto otorgado por Don Manuel San Juan Rodríguez el 30 de diciembre de 1972 ante el notario Jacobo Ortiz Murias mediante la Escritura Pública Núm. 93.

Por los fundamentos expuestos, *se dictará sentencia confirmatoria.*

El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Hernández Denton no intervinieron.